IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| FRED T. WORKMAN, II, | ) | Case No. 1:20-cv-184 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Fred T. Workman, II, seeks judicial review of the final decision of the Commissioner of Social Security, denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act.  This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).  Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Workman's applications for DIB and SSI be AFFIRMED.

## II.      Procedural History

Workman applied for DIB on September 7, 2017 and SSI on November 17, 2017. (Tr. 27, 207-18).[1]  Workman alleged that he became disabled on February 14, 2017, due to "breathing problems, knee problems, coronary artery disease, [and] high blood pressure."

---

[1] The administrative transcript appears in ECF Doc. 10.

(Tr. 207, 214, 246).  The Social Security Administration denied Workman's applications both initially and upon reconsideration.  (Tr. 72-125).  Workman requested an administrative hearing.  (Tr. 156-57).  ALJ Michael Schmitz heard Workman's case on July 3, 2019 and denied the claims in a July 23, 2019 decision.  (Tr. 19-71).  On December 2, 2019, the Appeals Council denied further review, rendering the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7).  On January 28, 2020, Workman filed a complaint to obtain judicial review.  ECF Doc. 1.

III.   **Evidence**

   A.   **Personal, Educational, and Vocational Evidence**

Workman was born on February 3, 1963, and he was 54 years old on the alleged onset date.  (Tr. 207).  Workman had a high school education.  (Tr. 247).  He had prior work experience as a machine operator and parts inspector.  (Tr. 47-57, 247).

   B.   **Relevant Medical Evidence**

On February 3, April 20, and November 1, 2016, Workman went to the emergency room for congestion, cough, fever, and a sore throat.  (Tr. 418, 421, 434).  On examination, James Steed, MD, noted that Workman had a regular heart rate, no murmurs or gallops, clear lungs, and normal strength.  (Tr. 418, 421, 434).

On February 2, 2016, Workman went to the emergency room for intermittent shortness of breath that was worse with exertion, on-and-off chest pain, a nonproductive cough with a runny nose, dull aching pain in the let precordial chest area, and tingling in the left arm.  (Tr. 439).  On examination, Michael Ady, MD, noted that Workman's heart was regular, lungs were clear, and legs showed no swelling or edema.  (Tr. 439).  An x-ray was unremarkable, an EKG showed no acute ischemia, a CBC was unremarkable, a chemistry panel was unremarkable, and initial troponin was negative.  (Tr. 439).  His blood pressure was 156/95.  (Tr. 439).  Dr. Ady noted that

he wanted to admit Workman for further testing, but Workman left against medical advice. (Tr. 439-40).

On December 12, 2016, Workman was admitted to the hospital after he complained of intermittent chest pain with exertion, nausea, diaphoresis, and shortness of breath.  (Tr. 463, 474).  On examination at admission, Samuel Lofgren, MD, noted that Workman had a regular heart rate and rhythm, no murmur, clear lungs, and 166/98 blood pressure.  (Tr. 463).  An x-ray of Workman's chest was normal, his EKG showed no acute changes, troponin was negative, and chemistry labs were normal.  (Tr. 463, 465, 471).  A CBC was remarkable for segmented neutrophils of 73 and lymphocytes of 19.  (Tr. 463).  On December 13, 2016, Eric Jopperi, DO, determined that Workman's symptoms were likely related to bronchitis, asthma, or COPD; prescribed prednisone; and recommended that Workman have a follow-up pulmonary evaluation to test for COPD or asthma.  (Tr. 471).  Dr. Jopperi also noted that Workman had elevated cholesterol and prescribed Pravachol.  (Tr. 471).  Dr. Jopperi noted on examination that Workman had no symptoms in his joints and extremities, regular heart rate and rhythm, and clear lungs with normal air movement.  (Tr. 475).  Workman's stress test was negative.  (Tr. 479).  At discharge Dr. Jopperi diagnosed Workman with chest pain, hypertension, and tobacco abuse. (Tr. 479).  He also gave Workman low-molecular weight heparin as a prophylactic for deep vein thrombosis.  (Tr. 479).

On February 14, 2017, Workman again went to the emergency room for a cough, shortness of breath, and intermittent chest pain with exertion.  (Tr. 484).  On examination, Alison Southern, MD, noted that Workman had a regular heart rate and rhythm, clear lungs, and no symptoms in his extremities.  (Tr. 484).  An x-ray showed no acute symptoms, an EKG showed no acute changes, a CBC and chemistry labs were unremarkable, and troponin was

3

indeterminate.  (Tr. 484, 486).  Workman refused admission and left against medical advice.
(Tr. 484).

On February 15, 2017, returned to the emergency department after having discomfort in
his chest again.  (Tr. 509).  Michael Ruhlin, MD, Mark Tereletsky, DO, and Cyril Ofori, MD,
noted that Workman reported that he had a burning sensation in his chest radiating down his left
arm and that it was worse with exertion.  (Tr. 502, 509, 515, 876, 880).  Workman also had
shortness of breath.  (Tr. 502, 510, 515, 876, 880).  On examination, Dr. Ruhlin, Dr. Tereletsky,
and Dr. Ofori noted that Workman had a regular heart and clear lungs.  (Tr. 502, 510, 517, 878,
880).  Workman denied any musculoskeletal pain.  (Tr. 516, 877).  An EKG showed no evidence
of acute ischemic changes.  (Tr. 502, 515, 876, 880).  A CBC, chemistry, and troponin were all
negative.  (Tr. 502, 515, 876, 880).  An x-ray showed no acute abnormalities.  (Tr. 504).  Dr.
Ruhlin and Dr. Tereletsky agreed to admit Workman, and Dr. Tereletsky noted that a cardiac
catheterization would be performed.  (Tr. 502, 518, 879-80).  Workman was diagnosed with
chest pain of unclear etiology, hypertension, and hyperlipidemia.  (Tr. 511, 518, 879).  Dr. Ofori
also determined that Workman had unstable angina with recent onset.  (Tr. 510).

On February 16, 2017, Cyril Ofori, MD, performed the cardiac catheterization.
(Tr. 520-21, 866-67).  Dr. Ofori noted that Workman had a distal 50-60% stenosis in his left
main artery, mild disease in the left anterior descending artery, a high-grade trifurcating lesion of
80% in the left circumflex artery, complex multiple stenotic lesions in the right coronary artery,
and borderline ejection fraction.  (Tr. 521, 866-67, 1258-59).  Dr. Ofori recommended coronary
artery bypass surgery, and Andrey Strunets, MD, concurred that revascularization surgery would
be necessary to address Workman's triple-vessel disease.  (Tr. 864, 867).  Michael Firstenberg,
MD, performed the urgent triple coronary artery bypass surgery.  (Tr. 859-61, 1265).  At a

4

follow-up on March 6, 2017, Dr. Firstenberg noted that Workman denied having any chest pain or palpitations.  (Tr. 849).  On examination, Workman had normal heart rate and rhythm, normal breathing, normal range of motion, and normal gait.  (Tr. 849).  Dr. Firstenberg noted that Workman's postoperative course was uncomplicated, that he was doing well, and that he would have "relatively minimal" medical needs with routine care.  (Tr. 850).

On February 20, 2017, David Cutler, MD, noted that a transesophageal echocardiogram showed normal left ventricle cavity size, moderate concentric left ventricular hypertrophy, 50% ejection fraction without focal wall motion abnormality, and normal systolic function.  (Tr. 856).  Workman had a normal right ventricle cavity size, normal wall thickness, and normal systolic function.  (Tr. 856).  Workman's ventricular and atrial septum had no evidence of defect, his left and right atrium were normal, and his mitral, aortic, tricuspid, and pulmonic valves were structurally normal with trivial regurgitation.  (Tr. 856-57).  His aorta was normal with mild atheromatous disease, and his pulmonary artery was normal.  (Tr. 857).

On March 22, 2017, Workman told Tiffany Fisher, PA-C, and Brian Donelan, MD, that he had mild shortness of breath with activity and fatigue, but he felt better after his surgery.  (Tr. 330).  Workman denied having any chest pain, orthopnea, palpitations, presyncope, or syncope.  (Tr. 330).  He also said that he continued to smoke.  (Tr. 330).  On examination, Workman had normal heart rate and rhythm, no murmur or gallop, normal lungs, and no musculoskeletal symptoms.  (Tr. 332).  Workman was diagnosed with coronary artery graft, hyperlipidemia, hypertension, and tobacco abuse.  (Tr. 333).  Fisher and Dr. Donelan recommended that Workman follow a low-fat, low-cholesterol, low-sodium diet, participate in cardiac rehabilitation, and continue with regular medical follow-ups.  (Tr. 333).  At a follow-up on May 24, 2017, Dr. Donelan noted that Workman had recovered nicely from his surgery, had

no apparent functional limitation, and could return to work without restriction. (Tr. 337).

Examination showed normal heart rate and rhythm, normal breathing, normal strength, and no

musculoskeletal symptoms. (Tr. 339-40). Dr. Donelan also noted that Workman's high intensity

statin therapy was treating his dyslipidemia well, and that his hypertension was also well-treated.

(Tr. 341).

On April 26, 2017, Workman told Steven Widmer, MD, that he had pain in both knees

ranging from 5 out of 10 to 7 out of 10 in severity. (Tr. 321). Workman said that his pain was

worse with prolonged walking, siting, and using the stairs. (Tr. 321). He also said that his knees

popped out of place, the pain woke him at night, and he had a reduced ability to perform daily

activities. (Tr. 321). On examination, Workman had an antalgic gait, joint tenderness in his

knees, and intact sensation. (Tr. 322). Imaging showed mild joint space narrowing, moderate

severe osteoarthritis, and lateral tilt of the patella in both knees. (Tr. 322). Dr. Widmer

diagnosed Workman with bilateral knee osteoarthritis and prescribed meloxicam. (Tr. 323).

From April 26 through July 31, 2017, Workman attended approximately 28 sessions of

cardiac rehabilitation. (Tr. 522-48, 561-673). At his first session on April 26, 2017, Jim

Freehahn, CRT, RCP, noted that Workman reported shortness of breath with exertion, sharp

pains in his chest on occasion, dizziness, and lightheadedness. (Tr. 523-24). Workman said that

his recreational activity included yard work, mowing, and gardening. (Tr. 524-25). Freehahn

noted that Workman's exercise plan included sitting for less than 3 hours per day and doing more

than 30 minutes of aerobic activity per day. (Tr. 530). Freehahn also referred Workman to diet

classes. (Tr. 531). On July 28, 2017, Freehahn noted that Workman was able to perform

moderate exercise for 30 minutes per day five days per week. (Tr. 614). On July 31, 2017, Tim

Hochsteller, an exercise specialist, noted that Workman was discharged from rehabilitation and

his goals – improved cardiac function, strength, and endurance – were achieved.  (Tr. 630).
Hochsteller noted that Workman was able to manage daily living activities and recommended
that Workman continue with exercise.  (Tr. 630).

On June 13, 2017, Workman told Derek Brown, DO, that he had shortness of breath with
minimal physical exertion, a chronic cough, and no chest tightness or pain.  (Tr. 399).
Examination showed normal heart rate and rhythm, no murmurs or gallops, good air movement
in the lungs, normal pulses, and no noted symptoms in his extremities.  (Tr. 401-02).  Dr. Brown
scheduled Workman for a walking oximetry study and pulmonary function test and
recommended that Workman stop smoking.  (Tr. 402).  At a follow-up on July 26, 2017,
Dr. Brown noted that pulmonary function testing showed evidence of a mild restrictive
ventilatory defect with mild reduction in diffusing capacity.  (Tr. 409).  The walking test did not
show any evidence of exertional hypoxemia.  (Tr. 409).  Examination showed regular heart rate
and rhythm, normal pulses, good air movement in the lungs, and no symptoms in his extremities.
(Tr. 412).

On July 26, 2017, Eileen Goldman, MD, noted that Workman's pulmonary function tests
"weren't bad," and that he denied "much chest pain."  (Tr. 898).  Workman also said that he had
no shortness of breath.  (Tr. 898).  On examination, Workman had regular heart rate and rhythm,
no murmurs or gallops, and full range of motion in all his extremities.  (Tr. 901).  He also had
normal attention and concentration.  (Tr. 901).  Dr. Goldman recommended that Workman
continue with his medications, exercise, and follow a low-fat and low-sugar diet.  (Tr. 903).

On August 30, 2017, Workman told Michael Ruhlin, MD, that he had gradual onset of
chest pain with a dull ache that radiated into his left shoulder and shortness of breath.  (Tr. 686).
Examination showed vitals in normal limits, regular heart rate and rhythm, clear lungs, and no

remarkable physical symptoms.  (Tr. 686).  An x-ray showed normal pulmonary arteries, normal lungs, and normal chest wall structures.  (Tr. 688-89).  Dr. Ruhlin recommended Workman be admitted to the hospital based on his underlying history of coronary artery disease.  (Tr. 686).

On August 31, 2017, Daniel Newton, MD, performed a left heart catheterization with graft angiography, which showed 60-70% distal left main, an occluded mid left circumflex, and occluded mid right coronary artery.  (Tr. 683-84, 694, 1256-57).  He had 50-55% left ventricle function with mild inferior posterior hypokinesis.  (Tr. 684, 694, 1256-57).  No intervention was recommended or performed.  (Tr. 684, 694).  On examination, Workman had a regular heart rate and rhythm, normal pulses, and clear lungs.  (Tr. 696).  Dr. Newton diagnosed Workman with coronary artery disease and hyperlipidemia, and he recommended that Workman continue with baby aspirin, Lopressor, lisinopril, and aggressive LDL reduction.  (Tr. 697-98).  On September 21, 2017, Dr. Newton wrote Workman a prescription for external counterpulsation therapy, noting that he was diagnosed with "atherosclerosis of nonautologous biological coronary artery bypass grafts with other forms of angina pectoris" and "disabling class III angina pectoria: patient experiences a marked limitation in ordinary physical activity."  (Tr. 766).

On September 24, 2017, Jodi Swihart, APRN-CNP, noted that Workman complained of palpitations and dyspnea with exertion.  (Tr. 892).  On examination, Workman had clear lungs, non-tender chest, non-displaced point of maximal impulse, normal heart rate and rhythm, full strength, normal gait, and normal attention/concentration.  (Tr. 896).  Swihart recommended that Workman continue with his medications and make lifestyle changes in his nutrition and physical activity.  (Tr. 896).  At a follow-up on November 5, 2017, Workman said that he occasionally had chest discomfort that resolved on its own after about 1 or 2 minutes without medication.  (Tr. 886).  He denied any chest pain or palpitations.  (Tr. 886).  Workman said he had joint pain,

back pain and muscle aches.  (Tr. 888).  On examination, Workman had clear lungs, regular heart rate and rhythm, non-tender chest, normal gait, crepitus in his knees, and normal attention/concentration.  (Tr. 889-90).  Swihart recommended that Workman continue with his medications and engage in regular exercise.  (Tr. 890).

On November 7, 2017, Workman told Michelle McConnell, PA-C, that he had increased chest discomfort. (Tr. 772).  He also said that he felt his breathing was worse and he could not walk 15eet before having shortness of breath.  (Tr. 772).  On examination, Workman had decreased breath sounds, distant regular heart rate and rhythm, no murmurs or gallops, normal pulses, and no noted symptoms in his extremities.  (Tr. 775).  McConnell referred Workman for a CT scan for further evaluation.  (Tr. 775).  Gabriele Pedicelli, MD, conducted the CT scan and noted that the findings were normal.  (Tr. 1260-61).

On February 2018, Workman told Dr. Brown that he had interval worsening of his shortness of breath and that he started smoking cigarettes again.  (Tr. 1206-07).  He also reported hypersomnia during the day, and that he slept 4-6 hours per night.  (Tr. 1206-07).  Workman denied having any chest pain at rest or with activity.  (Tr. 1209).  Examination showed that Workman was cooperative, and he had diminished but normal expiratory time in his lungs, regular heart rate and rhythm, no murmur or gallop, a steady gait, no noted symptoms in his extremities, and a positive mood/affect.  (Tr. 1210-11).  Dr. Brown ordered a pulmonary function test, an exercise test, and polysomnography.  (Tr. 1206).  On March 6, 2018, Dr. Brown noted that Workman's polysomnogram showed poor sleep efficiency, nocturnal hypoxia, mild obstructive sleep apnea, and periodic limb movement.  (Tr. 1232-33).  Dr. Brown recommended a CPAP titration study.  (Tr. 1233).  On March 14, 2018, Dr. Brown noted that a walk test showed physiologic tachycardia with exertion suggestive of deconditioning, but there was no

evidence of significant exertional oxygen desaturation.  (Tr. 1231).  On March 15, 2018,

Dr. Brown noted that the pulmonary function studies were "essentially within normal limits."

(Tr. 1229).

On March 15, 2018, Workman told Dr. Newton that he smoked 5 cigarettes per day, did

not exercise, and had some episodes of substernal chest pain while at rest.  (Tr. 1244).

Dr. Newton noted that Workman had no chest pain, no angina, and tolerated his Imdur well.

(Tr. 1244).  On examination, Workman had a regular heart rate and rhythm, normal heart sounds,

clear lungs, normal pulses, and the ability to move all extremities.  (Tr. 1247).  Dr. Newton

recommended that Workman continue with medication treatment, with some adjustment to

optimize his blood pressure and hyperlipidemia.  (Tr. 1248).  On May 18, 2018, Dr. Newton

noted that Workman had 168/84 blood pressure and regular pulse.  (Tr. 1239).  His lungs were

clear, he had a regular heart rate and rhythm, he had normal heart sounds, and he was able to

move all extremities.  (Tr. 1241).  Dr. Newton recommended a repeat heart catheterization and

graft angiography to determine if Workman had lost any other grafts postoperatively.  (Tr. 1241).

Dr. Newton also recommended aggressive antihypertensive control with medication.  (Tr. 1241).

On May 23, 2018, Dr. Newton performed the heart catheterization.  (Tr. 1237, 1251-54).

Dr. Newton determined that there were less than 30% mild luminal irregularities in the left

anterior descending artery, an occluded mid circumflex artery, and an occluded right coronary

artery. 1252-53).  The left main artery graft and left anterior descending graft was patent.

(Tr. 1253). The saphenous vein graft to the mid circumflex artery was patent.  (Tr. 1253).  And

the saphenous vein graft to the right coronary artery was totally occluded.  (Tr.1253).

On March 20, 2018, Norman Friedman, MD, noted that Workman was unable to tolerate

a CPAP machine and that it did not adequately control his obstructive sleep apnea symptoms.

10

(Tr. 1282).  Dr. Friedman recommended Workman use a BiPAP with a fitted mask and heated humidity.  (Tr. 1283).

On April 3, 2018, Christina Mueller, NP-C, noted that Workman's dyspnea on exertion was stable and anticipated that it would improve with use of his BiPAP while sleeping. (Tr. 1292).  Mueller also noted that Workman had Class 2 severe obesity due to excess calories and recommended that he begin a light exercise program for weigh loss.  (Tr. 1292).  Mueller noted that he had not been to the emergency department for any respiratory problems in a while, and that his pulmonary function test was within normal limits.  (Tr. 1293).  Workman also denied having any chest pain or palpitations.  (Tr. 1293).  On examination, Workman had normal breathing, his lungs were clear to auscultation, he had a regular heart rate and rhythm, he had a normal gait, and he had normal range of motion.  (Tr. 1296-97).  At follow-ups on July 24, August 23, and December 28, 2018, Workman told Mueller that he was compliant with his BiPAP therapy and felt more rested with BiPAP therapy, but he continued to have shortness of breath on exertion.  (Tr. 1299-1300, 1305-06, 1311).  Examinations showed normal breathing, clear lungs to auscultation, regular heart rate and rhythm, normal pulses, normal gait, and normal range of motion.  (Tr. 1303-04, 1309, 1315-16).  Muller continued her recommendation that Workman lose weight and quit smoking.  (Tr. 1299, 1311).

On October 17, 2018, Workman had an abnormal ECG.  (Tr. 1270).

On November 15, 2018, Russell Raymond, DO, and fellow Rayji Tsutsui, MD, noted that a diagnostic angiography showed severe right coronary artery stenosis.  (Tr. 1370); (Tr. 1272-76) (diagnostic angiography report).  Dr. Raymond and Dr. Tsutsui recommended that Workman take 81mg of aspirin per day, prescribed clopidogrel, recommended aggressive risk factor modification and medical therapy, and referred Workman to cardiac rehabilitation.  (Tr. 1371).

11

At a follow-up on March 8, 2019, Workman denied chest pain, shortness of breath, dyspnea on exertion, and palpitations.  (Tr. 1337).  On examination, Dr. Raymond noted that Workman had clear lungs, regular heart rate, normal heart sounds, intact pulses, and normal gait/ambulation. (Tr. 1340).  Dr. Raymond recommended that Workman continue with his medications, lose 25 to 30 pounds by dieting, and walking 2-3 miles per day for five days a week.  (Tr. 1341).

On December 5, 2018, Lisa Bartone, PA-C, noted that Workman had seen Kenneth Shafer, MD, on November 5, 2018, and reported continued shortness of breath and slightly improved angina.  (Tr. 1329).  Workman told Bartone that he had no improvement in his symptoms.  (Tr. 1329).  He said that he had exertional chest pain, fatigue, and shortness of breath.  (Tr. 1329).  Examination showed clear lungs, regular heart rhythm, normal heart sounds, normal extremities, and normal gait/ambulation.  (Tr. 1331).

On March 5, 2019, Dr. Shafer noted that Workman continued to have significant exercise intolerance, but his chest discomfort had improved.  (Tr. 1318).  Dr. Shafer stated that Workman would be enrolled in cardiac rehabilitation to improve exercise tolerance and decrease his weight.  (Tr. 1318).  On examination, Dr. Shafer noted that Workman's lungs were clear to auscultation, he had a regular heart rhythm and normal heart sounds, and he had no noted symptoms in his extremities.  (Tr. 1319).  From March 13 through May 1, 2019, Workman attended 16 cardiac rehabilitation session with Dr. Shafer.  (Tr. 1394-1424).  Throughout Workman's cardiac rehabilitation sessions, Dr. Shafer regularly noted that Workman "tolerated a self-directed, within-target exercise workload well without experiencing any adverse reactions, undue fatigue or other signs/symptoms indicative of ischemia or cardiac incompetence" and that he observed "[a]ppropriate cardiovascular response to exercise."  (Tr. 1394-1424).

On May 29, 2019, Bruce Arthur, MD, noted that a walk study showed that Workman was able to ambulate 1189 feet in 6 minutes with no assistive devices or breaks.  (Tr. 1378).  He did have "significant desaturation," indicating a respiratory limitation to exercise tolerance. (Tr. 1378).

### C.    Relevant Opinion Evidence

#### 1.    Treating Physician Opinion – Daniel Newton, MD

On July 2, 2018, Dr. Newton completed a "cardiac residual functional capacity questionnaire."  (Tr. 1268-69).  Dr. Newton noted that Workman was diagnosed with diastolic heart failure with symptoms including shortness of breath, edema, fatigue, and weakness. (Tr. 1268).  Dr. Newton said that Workman's prognosis was "good."  (Tr. 1268).  Dr. Newton marked "yes" under "Does your patient have *marked limitations of physical activity*, as demonstrated by fatigue, palpitation, dyspnea, or anginal discomfort on ordinary physical activity, even though your patient is comfortable at rest."  (Tr. 1268) (emphasis in original). Dr. Newton said that Workman was "[c]apable of low stress jobs," and stress would likely make his symptoms worse.  (Tr. 1268).  Dr. Newton opined that Workman could walk up to 2 city blocks without rest or severe pain, sit for at least 6 hours in a workday, and stand/walk for at least 2 hours in a workday.  (Tr. 1269).  He could frequently lift less than 10 pounds, occasionally lift up to 20 pounds, and never lift 50 pounds or more.  (Tr. 1269).  Dr. Newton said that Workman would have "good days" and "bad days," and he could be expected to be absent from work "[a]bout two days per month."  (Tr. 1269).

#### 2.    State Agency Consultant Opinions

On December 15, 2017, state agency consultant David Knierim, MD, evaluated Workman's physical functional capacity based on a review of the medical record.  (Tr. 78-81).

13

Dr. Knierim determined that Workman had the severe impairments of ischemic heart disease and dysfunction of major joints and the nonsevere impairment of COPD.  (Tr. 78).  Dr. Knierim opined that Workman could lift up to 20 pounds occasionally and 10 pounds frequently. (Tr. 79).  Workman could stand and/or walk for up to 6 hours in a workday and sit for up to 6 hours in a workday.  (Tr. 79).  Dr. Knierim said that Workman could frequently climb ramps/stairs and stoop; occasionally kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds; and balance without limitation.  (Tr. 79-80).  He was to avoid exposure to extreme heat, humidity, fumes, odors, dusts, gases, por ventilation, and hazards such as machinery and heights.  (Tr. 80).  Dr. Knierim also said that workman was "still able to walk, lift, move about, and perform [his] daily activities satisfactor[ily]," and that he was "limited to less strenuous types of work activities."  (Tr. 83).  On March 15, 2018, Abraham Mikalov, MD, concurred with Dr. Knierim's opinion.  (Tr. 105-10).

### D.    Relevant Testimonial Evidence

Workman testified at the ALJ hearing.  (Tr. 44-64).  Workman said that he would go up and down the stairs in his house up to four times per day, depending on if he had to do laundry. (Tr. 45).  He said that he had difficulty climbing stairs and had to sit down for breaks to catch his breath.  (Tr. 63).  Workman had a driver's license and could drive, but he only did so once or twice a week.  (Tr. 46).  In a typical day, Workman would sit in his house and sit on his front porch.  (Tr. 57).  His chores included laundry, sweeping the floors, and mowing the lawn on his riding lawn mower.  (Tr. 58).  He washed dishes every other night and sat on a stool to do it. (Tr. 61).  He said that his fiancée helped him shower because he would run out of breath moving his arms.  (Tr. 63).

Workman testified that he last worked in September 2017 for a temp agency, but the job only lasted "just a little over a week."  (Tr. 47-48).  In 2015 and 2016, he had worked as a parts inspector, which required him to stand, operate machines, and repair machines if needed. (Tr. 48-49).  The most he had to lift was 20-pound to 30-pound buckets.  (Tr. 50).  From 2008 to 2014, Workman was a machine operator and in 2014 his duties also included quality control. (Tr. 50).  He operated spot welders, worked standing up, and had to lift "maybe five pounds at the most" as a machine operator or 20 pounds as a quality control person.  (Tr. 50-51). Workman said that he also worked as a tow motor operator in 2006, and he did not have to do any lifting and carrying.  (Tr. 51-52).  Before that, Workman operated a machine that filled cans with glue for plumbing purposes, which he did standing up and which required him to lift "maybe ten pounds."  (Tr. 52-54).

Workman testified that he could not work anymore because he had a hard time breathing with exertion, and that he would get overheated and have to sit down and relax.  (Tr. 55).  He said that high blood pressure also limited his abilities.  (Tr. 55).  Workman said that he used an inhaler twice a day and a BiPAP when he slept.  (Tr. 55-56).  He said he did not have any side-effects form his medications.  (Tr. 56).  Workman said that he would "get out and walk as much as" he could and dieted to lose weight.  (Tr. 56).  He usually would walk for "at least half an hour" or more.  (Tr. 57).  He said that he could stand for up to 20 minutes or less before he had to sit due to his knee problems.  (Tr. 57).  He did not use a knee brace and his doctor had not recommended one.  (Tr. 58).  Workman said his doctor had told him a knee replacement surgery might be necessary in a few years.  (Tr. 58).  He had not received any injections in his knees. (Tr. 58).  Workman said that he continued to smoke notwithstanding doctor recommendations that he quit.  (Tr. 59).

15

IV.     **The ALJ's Decision**

The ALJ made the following paraphrased findings relevant to Workman's argument on

judicial review:

> 3.   Workman's severe impairments included atherosclerotic heart
> disease/coronary artery disease, chronic obstructive pulmonary disease, dyspnea
> on exertion, osteoarthritis of the bilateral knees, and obesity.  (Tr. 24-25).

> 4.   Workman retained the residual functional capacity to perform light work,
> except he could never climb ladders, ropes or scaffolds; occasionally climb ramps
> or stairs; occasionally kneel, crouch, and crawl; frequently balance and stoop; and
> needed to avoid exposure to extreme cold, heat, humidity, fumes, odors, dusts,
> gases, poor ventilation, and hazards such as unprotected height sand moving
> mechanical parts.  (Tr. 27).

> The ALJ "considered all symptoms" in light of the medical and other evidence.
> Workman's medically determinable impairments could reasonably be expected to
> cause the alleged symptoms, but his statements concerning the intensity,
> persistence, and limiting effects of his symptoms were not entirely consistent with
> the medical and other evidence in the record.  The ALJ noted that the objective
> medical evidence revealed favorable recovery from all cardiac episodes, that his
> treating physician was pleased with his recovery, and that he was able to tolerate
> increasing strength and endurance during cardiac rehabilitation while also
> remaining asymptomatic.  He was discharged from rehabilitation after having met
> all his goals, was able to manage all activities of daily living, and was noted in
> August 2017 to be able to resume full activity.  He had normal pulmonary
> function testing, he could walk 1,189 feet in 6 minutes with no assistive devices
> or breaks, and he was not recommended for supplemental oxygen.  Workman had
> bilateral knee pain, diagnostic imaging showed moderate severe osteoarthritis,
> and he had some tenderness to palpation.  Workman had a BMI of 37.4 (obesity)
> and his doctors had indicated that losing weight could help his breathing and knee
> problems.  Workman was able to engage in daily activities at a greater level than
> alleged, including walking every day for at least half an hour, sweeping, doing
> laundry, using a riding lawn mower, climbing stairs in his house, and driving.
> (Tr. 28-30).

> The state agency consultants' opinions were persuasive because the consultants
> were acceptable medical sources with program knowledge and experience, their
> opinions were consistent with records that were available when the opinions were
> made, and their opinions were still consistent with records available at the hearing
> stage.  (Tr. 30).

> Dr. Newton's opinion was not persuasive.  Dr. Newton had "opined that
> [Workman had] marked limitations of physical activity."  But that opinion was

16

> not supported by Workman's testimony or the record, especially when Workman was able to walk for thirty minutes or more per day and had responded well to cardiac rehabilitation exercise.  "If [Workman] was markedly limited in physical activity, he arguably could not walk for this length of time or successfully complete cardiac rehab."  (Tr. 31).

Based on all of his findings and VE testimony, the ALJ determined that Workman was able to perform his past work as a general inspector and had not been under a disability since February 14, 2017.  (Tr. 31-32).

## V.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, No. 19-2441, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a

"zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.");  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996));  *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.");  *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011);  *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010);  *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step sequential process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments,

meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant can perform his past relevant work in light of his RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, he can perform other work found in the national economy. 20 C.F.R. § 416.920(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that he is disabled and, thus, entitled to benefits. 20 C.F.R. § 416.912(a).

### B.    Step Four: Weighing Medical Opinion Evidence

Workman argues that the ALJ erred in his evaluation of Dr. Newton's opinion and the state agency reviewers' opinions. ECF Doc. 11 at 15-21.  Workman asserts that the ALJ did not adequately consider the specific limitations in Dr. Newton's opinion or indicate that he was aware of those limitations but discounted the opinion only because he disagreed with Dr. Newton's statement that Workman had "marked" physical limitations. ECF Doc. 11 at 16-17; ECF Doc. 14 at 2-4.  Workman contends that substantial evidence also did not support the reasons the ALJ gave for discounting Dr. Newton's opinions – that he could walk for 30 minutes and successfully completed cardiac rehabilitation – because medical records showed that he continued to have cardiac symptoms even after he completed rehabilitation. ECF Doc. 11 at 17-19; ECF Doc. 14 at 5-6.  Instead, Workman argues that the record shows that providers found he needed continued, aggressive medical treatment. ECF Doc. 11 at 19; ECF Doc. 14 at 5-6. Workman also contends that the ALJ's reliance on state agency reviewing physician opinions did not cure the error in how he weighed Dr. Newton's opinion because those physician's opinions were not consistent with other evidence in the record and because they did not have access to all of Workman's records. ECF Doc. 11 at 19-20; ECF Doc. 14 at 5.  Further, Workman asserts that

the ALJ's analysis effectively resulted in the ALJ improperly substituting his own opinion for Dr. Newton's opinion.  ECF Doc. 11 at 20-21; ECF Doc. 14 at 6.

The Commissioner responds that the ALJ adequately considered Dr. Newton's opinion in light of the record, and the ALJ was not required to discuss in his decision all the limitations mentioned in Dr. Newton's opinion.  ECF Doc. 13 at 6.  The Commissioner argues that, even though Workman identified evidence that could be considered consistent with his subjective complaints, substantial evidence still supported the ALJ's decision to find Dr. Newton's opinion unpersuasive.  ECF Doc. 13 at 6-7.  Further, the Commissioner asserts that the ALJ adequately considered all the evidence in the record.  ECF Doc. 13 at 7-8.  The Commissioner also contends that the ALJ applied proper legal standards and reached a decision supported by substantial evidence when he assigned greater weight to the state agency reviewing physicians' assessments than to Dr. Newton's opinion.  ECF Doc. 13 at 8-9.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. §§ 404.1520(e).  On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 17, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).  The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)." 20 C.F.R. § 404.1520c(a).  Nevertheless, an ALJ must "articulate how [he] considered the medical opinions and prior administrative medical findings" in adjudicating a claim.  20 C.F.R. § 404.1520c(a).  In doing so, the ALJ is required to explain how he considered the supportability and consistency of a source's medical opinion(s), but is not required to discuss other factors in

every case.  20 C.F.R. § 404.1520c(b)(2).  If the ALJ finds that two or more medical opinions "are both *equally well-supported and consistent* with the record but are not exactly the same," the ALJ must then articulate what factors were most persuasive in differentiating the opinions. 20 C.F.R. § 404.1520c(b)(3) (internal citations omitted) (emphasis added).  Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5). "Consistency" concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas "supportability" concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ applied proper legal standards in his evaluation of Dr. Newton's opinion and the opinions of the state agency consultants.  The ALJ complied with the regulations when he expressly noted that he was not permitted to give any particular weight or controlling weight to the opinions and specifically articulated that he found the state agency consultants' opinions persuasive but Dr. Newton's opinion not persuasive.  20 C.F.R. § 404.1520c(b)(2); (Tr. 30). Because the ALJ found that Dr. Newton's opinion was inconsistent with the other evidence in the record and the state agency consultant's opinions were consistent with the other evidence in the record, the ALJ was not required to provide any further explanation.  20 C.F.R. § 404.1520c(b)(2)-(3); (Tr. 30).  The ALJ also was not required to discuss or recite each of the specific limitations setting forth his analysis of Dr. Newton's opinion.  It was sufficient that the ALJ summarized the opinion; and his recitation of his analysis was sufficient because he stated that he found Dr. Newton's opinion that Workman had "marked limitations of physical activity"

21

was not supported by Workman's testimony or the other record evidence indicating that he could walk for thirty or more minutes per day and responded well to cardiac exercises.  *See Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (An ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding."); *Boseley v. Comm'r of Soc. Sec. Admin.*, 397 F. App'x 195, 199 (6th Cir. 2010) ("Neither the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion."); (Tr. 30).  And the ALJ's summary description of Dr. Newton's opinion accurately reflected that Dr. Newton had indicated Workman had "marked" physical limitations.  *Compare* (Tr. 30), *with* (Tr. 1268-69).  Further, the ALJ's analysis – in which he considered the medical opinions in light of the objective medical evidence and other evidence – was not the improper substitution of his own opinion for the medical opinions.  *See Poe*, 342 F. App'x at 157 ("[A]n ALJ does not improperly assume the role of a medical expert by assessing the medical and non-medical evidence before rendering a residual functional capacity finding."); (Tr. 30).

Substantial evidence also supported the ALJ's conclusion that Dr. Newton's opinions were inconsistent and not well-supported and that the state agency consultants' opinions were consistent and well-supported.  Such evidence included: (1) regular recommendations from treating physicians that Workman could improve his condition through diet and exercise; (2) examination findings that Workman had full strength, no symptoms in his joints, and a normal gait; (3) Workman's own statements that his activities included doing yard work and gardening; (4) that Workman was able to go through two separate rounds of cardiac rehabilitation and was discharged from both after meeting his treatment goals of improved cardiac function, strength, and endurance; (5) walking tests showing no evidence of exertional

hypoxia; (6) rehabilitation notes indicating that workman could tolerate exercise without experiencing any adverse reactions, undue fatigue, or other cardiac symptoms; and (7) Workman's testimony that he would walk for at least half an hour every day to lose weight. (Tr. 56-57, 332, 339-40, 409, 412, 475, 484, 524-25, 530, 614, 630, 686, 775, 849, 896, 1210-11, 1229-31, 1247, 1292, 1296-97, 1303-04, 1309, 1315-16, 1331, 1340, 1378, 1394-1424).  And the ALJ did not misconstrue the evidence in the record by stating that Workman successfully completed cardiac rehabilitation when the discharge notes from his first rehabilitation programs indicated that he had successfully met his goals and the notes in his second rehabilitation program stated that he had an appropriate cardiovascular response to exercise.  (Tr. 630, 1394-1424).

Workman has not demonstrated any error that would warrant remand in his argument concerning the manner in which the ALJ weighed the opinion evidence.

### C.  Step Four: Subjective Symptom Complaints

Workman argues that the ALJ failed to apply proper legal standards in evaluating his subjective symptom complaints.  ECF Doc. 11 at 21-24.  Workman asserts that, rather than considering all the evidence as a whole, the ALJ conducted a cursory review of the record and did not consider all of his impairments in combination, including his obesity.  ECF Doc. 11 at 23-24; ECF Doc. 14 at 6-8.

The Commissioner responds that the ALJ applied proper legal standards and reached a decision supported by substantial evidence in how he evaluated Workman's subjective symptom complaints.  ECF Doc. 13 at 9-11.  The Commissioner argues that the ALJ adequately considered all of Workman's conditions, including his obesity and chronic smoking, in his evaluation of Workman's subjective complaints.  ECF Doc. 13 at 11.  Further, the Commissioner

asserts that the ALJ adequately controlled for Workman's symptoms that were consistent with the other evidence in the record by including environmental and postural limitations in his RFC finding.  ECF Doc. 13 at 11.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 416.920(e).  The RFC is an assessment of a claimant's ability to do work despite his impairments.  *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)).  "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5.  Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also* SSR 96-8p, 1996 SSR LEXIS 5.

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms.  *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  An ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about his symptoms when it is inconsistent with objective medical and other evidence.  *See Jones*, 336 F.3d at 475–76; SSR 16-3p, 2016 SSR LEXIS 4 *15 (Oct. 25, 2017) ("We will consider an individual's statements about the intensity, persistence, and limiting effects of symptoms, and we will evaluate whether the statements are consistent with objective medical evidence and the other evidence.").  If an ALJ discounts or rejects a claimant's subjective complaints, he must state clearly his reasons for doing so.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

24

As a medically determinable impairment, obesity can be reasonably expected to cause limitations – including impaired ability for sustained sitting, standing, walking, and lifting. SSR 19-2p, 2019 SSR LEXIS 2, at *12-13 (May 20, 2019).  When an ALJ finds that a claimant's obesity is a medically determinable impairment, the ALJ must consider whether the claimant's obesity causes any exertional, postural, manipulative, or environmental limitations that would impact the claimant's ability to perform sustained work activity.  *Id.* at *13-14.[2]

The ALJ applied proper legal standards in his evaluation of Workman's RFC and subjective symptom complaints.  The ALJ complied with the regulations by expressly considering all of Workman's severe and non-severe impairments in light of the medical and other evidence.  20 C.F.R. § 416.920(e); SSR 96-8p, 1996 SSR LEXIS 5; (Tr. 28-31).  The ALJ correctly noted that he was required to assess the effect of Workman's obesity on his functional capacity under SSR 19-2p and that Workman's physicians had indicated his obesity and other symptoms contributed to his shortness of breath.  SSR 19-2p, 2019 SSR LEXIS 2, at *13-14; (Tr. 29-30).  In doing so, the ALJ exhaustively summarized the medical records.  (Tr. 29-30).  Further, the ALJ explained that Workman's subjective complaints regarding the intensity, persistence, and limiting effects of his symptoms were not consistent with the other evidence in the record and incorporated any supported limitations into his RFC finding.  *Blankenship*, 874 F.2d at 1123; *Felisky*, 35 F.3d at 1036; (Tr. 29-30).

Substantial evidence also supported the ALJ's decision to discount Workman's subjective complaints and his findings regarding Workman's RFC.  Such evidence included: (1) regular findings that Workman had a regular heart rate and rhythm, clear lungs, no gait issues, full

---

[2] The previous sub-regulatory ruling directing how ALJs evaluate obesity also included a requirement that the ALJ also "explain how [he] reached [his] conclusions on whether obesity caused any physical or mental limitations," but that requirement was removed in the revised ruling.  *Compare* SSR 02-1p, 2002 SSR LEXIS 1, at *18 (Sept. 12, 2002) (rescinded), *with* SSR 19-2p, 2019 SSR LEXIS 2, at *13-14.

strength, full range of motion, no edema in his extremities, normal pulses, and no need for assistive devices when walking; (2) notes indicating that Workman was able to tolerate exercise with normal cardiac response and completed a cardiac rehabilitation program with improved strength and endurance; (3) test findings that Workman had normal pulmonary function and no hypoxia after walking; (4) physician notes indicating that Workman could improve his shortness of breath after using a BiPAP while sleeping and with diet and exercise (2-3 miles walking per day); (5) unremarkable or normal diagnostic imaging results; (6) Dr. Firstenberg's notes that Workman had "relatively minimal" medical needs; (7) Dr. Donelan's statements that Workman could work without restriction in May 2017; and (8) Workman's own statements indicating that he was able to do yard work, go up and down stairs a few times a day, and walk for 30 minutes every day.  (Tr. 56-57, 332, 337, 339-40, 402, 409, 412, 418, 421, 434, 439, 463, 465, 471, 474-75, 484, 486, 502, 510, 515, 517, 524-25, 530, 614, 630, 686-89, 696, 775, 849-50, 856-57, 876, 878, 880, 896, 889-90, 901, 903, 1210-11, 1230-33, 1247, 1260-61, 1292-93, 1296-97, 1303-04, 1309, 1315-16, 1319, 1331, 1340-41, 1394-1424).  Even if other evidence – or even a preponderance of the evidence – might have supported a finding that Workman's subjective complaints were consistent with the other evidence in the record and a more-restrictive RFC finding, the ALJ's evaluation of Workman's subjective complaints and RFC fell within the Commissioner's "zone of choice" because it was reasonably drawn from the record.  *O'Brien*, 819 F. App'x at 416; *Rogers*, 486 F.3d at 241; *Biestek*, 880 F.3d at 783; *Mullen*, 800 F.2d at 545. And this court cannot second-guess the ALJ's conclusion.  *O'Brien*, 819 F. App'x at 416; *Mullen*, 800 F.2d at 545.

Upon careful consideration of the record before the court, it is apparent that Workman has not demonstrated that the ALJ failed to apply proper legal standards or reach a conclusion supported by substantial evidence in evaluating Workman's subjective complaints and RFC.

## VI.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Workman's applications for DIB and SSI be AFFIRMED.

Dated: December 21, 2020

Thomas M. Parker
United States Magistrate Judge

---

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn*, 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).